**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

|                          |     |                           |
|--------------------------|-----|---------------------------|
|                          | )   |                           |
| **IN THE MATTER OF**     | )   |                           |
| **THE EXTRADITION OF**   | )   | **Case No: 1:25-mj-02312-JMC** |
| **DOMINIC JASON MOORE**  | )   |                           |
|                          | )   |                           |

**<u>MEMORANDUM OF LAW IN SUPPORT OF REQUEST FOR
EXTRADITION CERTIFICATE PURSUANT TO 18 U.S.C. § 3184</u>**

The United States, in fulfilling its treaty obligations and acting at the request of the

Government of Germany, respectfully requests that this Court issue a certificate of extraditability

pursuant to 18 U.S.C. § 3184 for the fugitive in this case, Dominic Jason Moore ("MOORE").

MOORE has been arrested pursuant to the complaint that was filed by the United States.

ECF 1.  He had his initial appearance on the complaint on September 26, 2025.  ECF 7.

It now remains for the Court to conduct a hearing under Section 3184 to determine

whether a certificate should be issued.  In this matter, the Court's limited role is to determine

whether Germany has presented evidence "sufficient to sustain the charge under the provisions

of the proper treaty or convention."  18 U.S.C. § 3184.  The standard for making this finding is a

familiar one: probable cause.  If the Court finds there is probable cause to support the charges

against MOORE, and that the other treaty requirements are met, it must certify as much to the

U.S. Secretary of State, who will then make the final determination regarding MOORE's

extradition.

Because Germany has submitted more than enough evidence to demonstrate probable

cause, and because the other requirements for extradition have been met, the United States

requests that the Court certify to the Secretary of State that MOORE be extradited to Germany.

# I.  FACTUAL BACKGROUND

Germany seeks MOORE's extradition for second-degree murder, in violation of Section 212 of the German Criminal Code.  A warrant for MOORE's arrest on this charge was issued on August 20, 2024, by the Regional Court in Kaiserslautern, in the German state of Rhineland-Palatinate.  Exhibit 1 at 79-87

It is alleged that, on the morning of August 3, 2024, between approximately 8:00 and 8:27 a.m. in the hallway of Building 2004 located on a fenced-in construction site at Vogelweh Air Base in Germany, MOORE assaulted 63-year-old Samir Mziou ("Mziou or "the victim"), causing Mziou's dentures to fall out, and then strangled him, likely using a T-shirt.  MOORE then dragged Mziou down the hallway to the second-to-last room of Building 2004 and left him there to die.   The evidence implicating MOORE is based on witness testimony of construction company employees who saw both MOORE and the victim immediately before- and following- the assault and who will testify about MOORE's suspicious behavior, the tension between MOORE and Mziou and the fact that only MOORE and the victim were in the building at the time of Mziou's murder.  This witness testimony is further corroborated by DNA evidence, further detailed below, which confirms the presence of MOORE's DNA on the body of the victim, the victim's DNA on MOORE, and cannot exclude the victim's DNA as a contributor to a mixed profile obtained from MOORE's T-shirt, believed to be the murder weapon.  Germany submits the following facts in support of the arrest warrant and extradition request:

Starting on August 1, 2024, MOORE, a United States citizen, began working on a construction site for Toukabri Schadstoff und Umwelttechnik, a company contracted to conduct demolition work on the grounds of Vogelweh Air Base, Haderwald, 67661 Kaiserslautern,

2

Germany. Tunisian citizen Samir Mziou, the victim in this case, was employed by the company as a foreman. Amir Toukabri ("Toukabri") was the head of the construction company.

As described in the German arrest warrant, tensions had arisen between the victim and MOORE on MOORE's first day of work. According to Toukabri, Mziou complained to Toukabri that MOORE could not sand properly and would not listen to him as the foreman. As a result, Toukabri had to speak to MOORE and told him that Mziou was the foreman and that MOORE had to listen to him. On MOORE's second day of work, he told a co-worker that he didn't want to work and would try to hide in the rooms. Mziou found out and told MOORE's employer, who asked him to work.

According to Toukabri, on the morning of August 3, 2024, he picked MOORE up from his company-provided accommodation and registered him in at the front gate of the military base, which records reflect occurred at approximately 7:53 A.M. Toukabri then dropped MOORE off outside of building 2007 and told MOORE, who was wearing shorts and a gray T-shirt, to walk to building 2004 and put on his work pants before starting work. At the time of MOORE's arrival to building 2004, which is estimated at approximately 8:00 A.M., the other employees were already at work at the jobsite, which was taking place in buildings 2000 and 2007.

Shortly after MOORE left on foot for building 2004 (an approximate 2 minute, 40 second walk), Toukabri reported that the victim Mziou left in his pickup truck to drive to building 2004 to pick up a box of bits for a cordless screwdriver needed at the construction site (an approximate 1 minute 20 second drive). Before the victim's departure, Toukabri observed him wearing his helmet, getting into his vehicle, and driving alone. When the victim took longer than anticipated

to bring back the box of bits, a co-worker, and Toukabri's brother, Eimen Toukabri ("Eimen") called Mziou's phone at 8:17 A.M, as later confirmed by an examination of the victim's phone. Mziou did not answer the call.  Shortly thereafter, Toukabri and another co-worker Mohamed Ezzraibi ("Ezzraibi") decided to go to Building 2004 to retrieve a laptop cable, and to see why neither Mziou nor MOORE had returned to the jobsite.

At approximately 8:25 A.M., Toukabri and Ezzraibi entered building 2004, first taking notice that Mziou's pickup truck was still running outside with its lights on.  Once inside, Toukabri saw MOORE, shirtless, and wearing his work pants.  Ezzraibi noticed that MOORE was holding a gray T-shirt in his hand.  Toukabri asked MOORE if he had seen Mziou, and MOORE initially did not answer.  When Toukabri asked MOORE again if he had seen Mziou, MOORE replied "no."   MOORE was the only person present in building 2004.

Toukabri later told investigators that he first searched for Mziou in the restrooms of the building.  He then returned to Ezzraibi in the entrance area of the building, who confirmed that he had not seen Mziou either.  Toukabri proceeded to open every door in the building until he reached the penultimate room, an unused room at the back of the building where there was no reason for Mziou to be.  There, he found Mziou lying in a corner, on his right side with both arms stretched above his head (as though he had been dragged); he was unconscious, and his face had turned blue.  Toukabri screamed and Ezzraibi ran to him.  Toukabri then attempted to resuscitate Mziou, and subsequently called his brother Eimen and emergency services at 8:28 A.M.  Eimen arrived and continued to attempt to resuscitate the victim, while Toukabri drove to the military police station.  Eimen noticed, while attempting to resuscitate the victim, that part of his dentures were missing.

Karly R. Pfaff ("Pfaff") of the 2nd Military Police Company was in the control room of the Provost Marshal's Office, when Toukabri, who she did not know at the time, ran up to her and said that he needed emergency medical services at the construction site. Toukabri then led her to Mziou, and Pfaff began resuscitation measures.

Resuscitation measures were terminated at 9:03 A.M. and Mziou was pronounced dead at the scene.

Toukabri began searching for MOORE, suspecting that he was responsible. He found MOORE in building 2007 (the construction site) wearing a dark T-shirt. Toukabri then took MOORE back to building 2004 and turned him over to the military police, telling them that he suspected that MOORE, who was the only other individual present in building 2000, had killed Mziou. While detained by military police outside of building 2004, Eiman observed MOORE take an energy drink out of his backpack and drink from it, while deliberately pouring some of the liquid inside his backpack.

MOORE was temporarily arrested, searched, and taken into custody at approximately on the day of the murder, August 3, 2024. The military police who arrested MOORE noted that he was "remarkably calm, as if nothing had happened," and did not ask why he was being arrested. While detained, MOORE did a number of push-ups and stretching exercises. The military police confiscated MOORE's backpack and photographed all of the items inside, including MOORE's passport and a gray T-shirt which was later secured in an evidence bag and turned over to the German police. The military police also observed that the gray T-shirt was wet, consistent with Eiman's observations of MOORE pouring a liquid energy drink into his backpack. A saliva sample was taken from MOORE, and forensic evidence in the form of abrasions was also

collected from MOORE.

Forensic experts conducted an autopsy of Mziou's body on August 4, 2024, and found, among other things, both-sided hemorrhaging of the soft tissues of the neck, with the emphasis on the deeper lawyers of the neck muscles and directly at the larynx, massive asphyxiation hemorrhages in the lungs, and no indication of any natural cause of death. Fresh skin hemorrhages were observed on the left cheek and right temple, consistent with a blow with a flat hand or fist. Forensic experts thus found a strong suspicion that cause of death was fatal neck compression by another hand. According to the German request, a manual attack on the neck by chocking, strangulation, or strangulation using a textile is likely. Given the lack of external skin lesions on the victim's neck, the attack was likely not bare handed, but instead was a strangulation attack with indirect compression, possibly by placing a textile underneath the hand during the attack. The forensic experts also noted that it was possible that the victim could have been choked, if the choking instrument had been applied broadly enough that it neither left typical strangulation marks on the skin nor marks consistent with choking the victim.

DNA extracted from MOORE's saliva was compared with DNA-containing traces found on the victim's body, as was the victim's DNA compared to traces recovered from MOORE and MOORE's seized gray T-shirt. That comparison was done by Dr. Michaela Groß of the Rhineland-Palatinate State Office of Criminal Investigations. Dr. Groβ concluded that a trace from the victim's right thumb was a match to MOORE's DNA, and a trace on MOORE's right little finger matched with the victim. Dr. Groß's report determined that MOORE could not be excluded as a partial contributor to the mixed traces recovered from the victim's jeans, the victim's T shirt, the victim's hands and the victim's neck abrasions. The victim cannot be

excluded as a partial contributor to the mixed traces on MOORE's hand abrasions and his gray T shirt (the suspected murder weapon).

The crimes scene investigation unit of the Kaiserslautern Detective Squad examined and photographed the crime scene on the day of the incident, August 3, 2024. They found Mizou's helmet lying in the tool room, and a bag of tool accessories and Mizou's lower dentures in the hallway of the building. The Chief Inspector later inspected the fence surrounding the construction site, taking photographs to document its condition. The police discovered no damage to the fence, nor did they observe any trampled vegetation surrounding the fence.

German prosecutors were able to secure an arrest warrant on August 20, 2024; however, MOORE had absconded by the time the arrest warrant was issued. The German extradition request notes that MOORE served in the United States Army from November 15, 2016, until October 20, 2021. Germany has also provided photographs of MOORE taken the day of the murder, and a copy of MOORE's passport photo page obtained while he was detained by the military police.

Accordingly, Germany has sought MOORE's extradition, pursuant to its extradition treaty with the United States.[1] The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for MOORE's arrest. This Court issued the arrest warrant, and MOORE was arrested on September

---

[1] Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., June 20, 1978, T.I.A.S. No. 9785, *as amended by* the Supplementary Extradition Treaty with the Federal Republic of Germany, U.S.-F.R.G., Oct. 21, 1986, S. TREATY DOC. NO. 100-6 (1987), *and* the Second Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S. TREATY DOC. NO. 109-14 (2006) (collectively, the "Treaty")

25, 2025.  MOORE is currently in the custody of the U.S. Marshals Service.

## II.  APPLICABLE LAW

### Applicable Law

## I.    LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

The extradition process is *sui generis*, neither a criminal nor a civil proceeding.  The framework applicable to the United States' extradition proceedings is described below along with the court's circumscribed role in the extradition process.

### A.    The Role of the Court in Extradition Proceedings

Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge."  18 U.S.C. § 3184; *see also Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014); *Sidali v. I.N.S.*, 107 F.3d 191, 195 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998).  At the extradition hearing, the court's role is to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification are satisfied.  *Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000).  If the court finds that the requirements for certification have been met, the court must furnish a certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender.  18 U.S.C. § 3184; *see Ordinola v. Hackman*, 478 F.3d 588, 609 (4th Cir. 2007) (Traxler, J., concurring), *cert. denied*, 552 U.S. 947 (2007); *Cheung*, 213 F.3d at 88.   The Secretary of State, and not the

8

court, makes the decision regarding whether the fugitive should ultimately be surrendered to the

requesting country. 18 U.S.C. §§ 3184, 3186; *Plaster v. United States*, 720 F.2d 340, 354 (4th

Cir. 1983).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal

issues peculiarly suited for judicial resolution, such as questions of the standard of proof,

competence of evidence, and treaty construction, yet simultaneously implicate questions of

foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*,

110 F.3d 103, 110 (1st Cir. 1997).

### B.    The Requirements for Certification

At the extradition hearing, the court's review will be limited to determining whether: (1)

the judicial officer is authorized to conduct the extradition proceeding; (2) the court has

jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes

for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient

evidence to support a finding of probable cause as to each charge for which extradition is sought.

*In re Extradition of Exoo*, 522 F. Supp. 2d 766, 775 (S.D. W. Va. 2007); *see also Hoxha v. Levi*,

465 F.3d 554, 560 (3d Cir. 2006).  The following sections briefly discuss each finding the court

must make in order to issue the certification to the Secretary of State.

#### i.    Authority of the court over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of

the United States, or any magistrate judge authorized so to do by a court of the United States, or

any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  As such,

the judicial officer conducting the extradition hearing that Section 3184 prescribes does not

exercise "any part of the judicial power of the United States," but, rather, acts in a "non-

institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999); *In re Extradition of Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *3 (W.D. Va. Sept. 16, 2013).

### ii. *Jurisdiction over the fugitive*

The court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### iii. *Treaty in full force and effect*

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. *See Hoxha*, 465 F.3d at 562; *Zhenli Ye Ge v. Holder*, 992 F. Supp. 2d 637, 644 (W.D. Va. 2014). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and Germany. The court should defer to the Department of State's determination in that regard. *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997) ("[O]n the question whether [the extradition] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance" (quoting *Terlinden v. Ames*, 184 U.S. 270, 285 (1902)); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive,

the meaning attributed to treaty provisions by the Government agencies charged with their

negotiation and enforcement is entitled to great weight.").

<em>iv.    Crime covered by the treaty</em>

Extradition treaties create an obligation for the United States to surrender fugitives under

the circumstances defined in the treaty.  Here, Article 1 of the 1978 Treaty provides for the

extradition of individuals charged with, or convicted of, an extraditable offense.  Article 2 of the

1978 Treaty, as amended by Article 1 of the 1986 Supplementary Treaty, provides that an

offense is extraditable if "punishable under the laws of both Contracting Parties."  1986

Supplementary Treaty, art. 2(a)(1).

Consequently, in assessing whether the crime for which extradition is requested is

covered by the Treaty, Exhibit 1 at 7-50, the court will examine the description of criminal

conduct provided by Germany in support of its charges and decide whether that conduct would

be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of

a preponderance of the states.  *See Wright v. Henkel*, 190 U.S. 40, 61 (1903); *Zhenli Ye Gon*, 774

F.3d at 210; *Hu Yau-Leung v. Soscia*, 649 F.2d 917, 918 & n.4 (2d Cir. 1981).  A requesting

country need not establish that its crimes are identical to ours.  *Zhenli Ye Gon*, 774 F.3d at 217.

Indeed, "[t]he law does not require that the name by which the crime is described in the two

countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other

respects, the same in the two countries. It is enough if the particular act charged is criminal in

both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the judicial officer should liberally construe

the applicable extradition treaty in order to effectuate its purpose, namely the surrender of

11

fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933).

Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just

obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902), the court should

"approach challenges to extradition with a view toward finding the offense within the treaty,"

*McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828

F.3d 451, 463 (6th Cir. 2016) ("The point of an extradition treaty after all is to facilitate

extradition . . . .").

> *v.    Probable cause that the fugitive has committed the offenses*

To certify the evidence to the Secretary of State, the court must next conclude that there

is probable cause to believe that the crime charged by Germany was committed by the person

before the court. Probable cause is established if there is "competent evidence to justify holding

the accused to await trial." *Ordinola*, 478 F.3d at 608 (internal quotation marks omitted) (citing

*Hoxha*, 465 F.3d at 561); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for

arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a

prudent man in believing that the (suspect) had committed or was committing an offense.")

(internal quotation marks and citation omitted).

The extradition judge's probable cause determination is "not a finding of fact in the sense

that the court has weighed the evidence and resolved disputed factual issues," but instead

"serve[s] only the narrow function of indicating those items of submitted evidence on which the

decision to certify extradition is based." *Quinn*, 783 F.2d at 791 (internal quotation marks and

citation omitted).

### C.    Procedures Applicable To Extradition Proceedings

The extradition hearing is "not designed as a full trial" but as a means of "inquir[ing] into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country." *Peroff*, 542 F.2d at 1249.  The extradition judge's certification decision "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (internal quotations and citation omitted).

In evaluating whether certification of extradition is warranted, "the evidence considered by the magistrate as part of an extradition hearing 'need not meet the standards for admissibility at trial' and 'may be based upon hearsay in whole or in part.'"  *Ordinola*, 478 F.3d at 608. "Unsworn statements can be sufficient to support a probable cause determination." *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008).  Neither the Federal Rules of Criminal Procedure, nor Federal Rules of Evidence apply to extradition proceedings.[2]  *See Haxhiai,* 528 F.3d at 292. In this way, a certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Skaftouros v. United States*, 667 F.3d 144, 155 & n.16 (2d Cir. 2011).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *Yordi v. Nolte*, 215 U.S. 227, 231-32 (1909); *Shapiro v. Ferradina*, 478 F.2d 894, 902 (2d Cir. 1973). Requiring the "demanding government to send its citizens to another country to institute legal

---

[2] Fed. R. Crim. P. 1(a)(5)(A) states: "Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."  Fed. R. Evid. 1101(d)(3) provides: "These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."

proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the international obligations of the United States under an extradition treaty, a fugitive's opportunity to challenge the evidence introduced against her is very circumscribed. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country but may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 457-58 (1913); *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) (noting that "'it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded'") (citation omitted); *In re Extradition of Atuar*, 300 F. Supp. 2d 418, 427 (S.D. W. Va. 2003) ("The Court may not admit and consider evidence submitted by Relator which merely conflicts with or contradicts evidence submitted by the United States on the issue of probable cause or impeaches the credibility of witnesses, but the Court may admit and consider explanatory evidence submitted by Relator if it would clearly negate or obliterate probable cause."). A contrary rule might compel the "demanding government to produce all its evidence … both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316). Courts also routinely reject technical and affirmative defenses in extradition proceedings. *See Bingham*, 241 U.S. at 517 (rejecting objections that "savor of technicality"); *Shapiro*, 478 F.2d at 901. This is because these issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve at trial.

Moreover, the fugitive has no general right to discovery in an extradition proceeding.  *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).  The fugitive's right to present evidence is severely constrained, *Shapiro*, 478 F.2d at 900-01; and her constitutional rights are limited, *see Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. 2005) ("[extradition] proceedings are not designed to determine the guilt or innocence of the accused, and therefore, certain due process protections are simply not applicable.").  For example, the fugitive has no right to cross-examine witnesses, *Skaftouros*, 667 F.3d at 155 n.16; there is no Sixth Amendment right to a speedy trial, *Jhirad*, 536 F.2d at 485 n.9; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (citing *Collins v. Loisel*, 262 U.S. 426, 429 (1923)); the exclusionary rule does not apply, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and the fugitive does not have the right to confront her accusers, *Bingham*, 241 U.S. at 517.

Finally, in addition to having limited rights of presenting evidence, fugitives are circumscribed in the kinds of defenses they can make.  All matters a fugitive might raise as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not the Court.  *See* 18 U.S.C. §§ 3184, 3186.  This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's "powers to conduct foreign affairs."  *See In re Kaine*, 55 U.S. 103, 110 (1852).  In this way, a fugitive need not and cannot raise humanitarian claims and claims regarding the applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country; those are

the kinds of issues that the Secretary will weigh. *See Mironescu*, 480 F.3d at 666-69 (noting that

"'[u]nder what is called the 'rule of non-inquiry' in extradition law, courts in this country refrain

from examining the penal systems of requesting nations, leaving to the Secretary of State

determinations of whether the defendant is likely to be treated humanely'") (citation omitted);

*Atuar*, 300 F. Supp. 2d at 426; *see also Jhirad*, 536 F.2d at 484-85 ("It is not the business of our

courts to assume the responsibility for supervising the integrity of the judicial system of another

sovereign nation."). Similarly, a fugitive's contention that the extradition request is politically

motivated or that the requesting state's justice system is unfair, should be addressed by the

Secretary of State, not the U.S. Court weighing extradition. *Id.*

While these precedents make for a rather circumscribed, narrow process, these rules are

necessary and in place because "extradition proceedings are not to be converted into a dress

rehearsal trial" for the trial that will take in the requesting country; rather, such searching trials

must take place in the requesting country in the first instance. *Jhirad*, 536 F.2d at 484 (citing

*Charlton*, 229 U.S. at 460.

## III.  ARGUMENT

### A.    The Court Should Issue a Certificate of Extraditability Under 3184

Here, as discussed further below, all the requisites for the issuance of a certificate of

extraditability are met. The alleged crimes are covered by the Treaty, and the German

government has submitted proof of MOORE's culpability in the charged conduct. Because this

exceeds the low bar of probable cause, this Court should issue the requested certificate under

3184.

### 1.    This Judicial Officer Has Authority to Conduct These Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  United States Magistrate Judges may issue certifications under Section 3184.  *See DeSilva*, 181 F.3d at 867.  Indeed, the Local Rules of this Court expressly vest U.S. Magistrate Judges with jurisdiction to conduct these proceeded.  D. Md. Local Rule 301(6)(v).  Accordingly, this first criterion is met.

### 2.    This Court Has Jurisdiction Over the Fugitive

The Court has personal jurisdiction over a fugitive found within its jurisdictional boundaries.  18 U.S.C. § 3184 (granting jurisdiction over "any person found within his jurisdiction"); *Ye Gon*, 774 F.3d at 214.  Here, MOORE was arrested on September 26, 2025, in Baltimore, Maryland.  As such, there is personal jurisdiction over MOORE in the Northern Division of the United States District Court for the District of Maryland.

### 3.    The Treaty Between The United States And Germany Is In Force

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States.  *See Etouman*, 533 F. Supp. 3d at 316.  Here, Stacy Hauf, an Attorney Adviser for the U.S. Department of State, has provided a declaration stating that an extradition treaty went into effect June 20, 1978, between the United States and Germany.  Exhibit 1 at 1-2.  The Supplementary Treaty to the 1978 Treaty was signed on October 21, 1986, and the Second Supplementary Treaty to the 1978 Treaty was signed on April 18, 2006 (collectively, the "Treaty").  *Id.* at 7-50.  Such declaration is entitled to deference by this Court and conclusively establishes this criterion for extradition.  *See*

17

*Terlinden*, 184 U.S. at 288; *Charlton*, 229 U.S. at 468; *Arias v. Warden*, 928 F.3d 1281, 1288

(11th Cir. 2019) ("[C]ourts *must* defer to the determination of the executive branch in deciding

whether an extradition treaty remains in force." (emphasis in original, internal quotation marks

omitted)).

4.      **The Crimes for Which Extradition Is Sought Are Covered by the Treaty**

Next, the Court must assure itself that extradition is being sought in conformity with the

text of the treaty.  Here, Article 1 of the U.S.-Germany Treaty provides for the return of fugitives

"who have been charged with an offense or are wanted by the other Contracting Party for the

enforcement of a judicially pronounced penalty or detention order for an offense committed

within the territory of the Requesting State."  Exhibit 1 at 8.  Further, Article 2 of the Treaty

defines an offense as extraditable if it is "punishable under the Federal laws of the United States

and the laws of the Federal Republic of Germany."  *Id.*

Accordingly, this Court must examine the conduct that Moore has been charged with in

Germany and determine whether such conduct would be similarly held to be criminal conduct

under U.S. law.  *See Wright*, 190 U.S. at 61; *Zhenli Ye Gon*, 774 F.3d at 210.  In making this

inquiry, however, the Court need not require one-to-one correlation and exactitude; it is enough

if both countries punish roughly similar conduct.  *Zhenli Ye Gon*, 774 F.3d at 217 (noting that

"dual criminality requires only that the offenses in the two countries punish the same basic evil;

it does not require that the offenses contain identical elements").  Further, to effectuate the

purpose of the Treaty, courts must resolve all ambiguities in favor of finding the conduct is

extraditable under the treaty.  *Factor v. Laubenheimer*, 290 U.S. 276, 296 (1933).

Here, Moore has been charged with second-degree murder under Section 212 of the Germany Criminal Code.  *See* Exhibit 1 at 70, 79.   The complaint confirms that there is strong suspicion of homicide against the Defendant and goes on to summarize the background of the case giving rose to that strong suspicion.  Exhibit 1 at 79-84.

United States law obviously punishes this very same conduct had it been committed within the United States.  18 U.S.C. §§ 1111 *et seq*.  And Moore's conduct would satisfy the elements of second-degree murder under the same statute.  *See*, *e.g.*, *United States v. Medina-Garcia*, 226 F. App'x 281, 285 (4th Cir. 2007) (identifying second-degree murder as any other murder other than one with malice aforethought.)  Accordingly, the crime for which MOORE is being extradited clearly falls under the Treaty and constitutes the kind of crime that is punishable under U.S. law.

**5.    There Is Probable Cause that the Fugitive Has Committed the Offenses**

Finally, this Court should issue the certificate of extradition because the Government of Germany has more than ample evidence to satisfy the low bar of probable cause that MOORE committed the crime as charged.

The German prosecutor explained in detail that MOORE and the victim were both scheduled to work on a certain construction site and that a witness instructed MOORE to change his clothes in building 2004 before work at the same time the victim drove his pickup truck to building 2004 to pick up a tool, all around 8:00 A.M. on August 3, 2024.

After several minutes, during which the victim did not return from building 2004, a coworker called the victim and then then went to building 2004 to find the victim when nobody responded.  Upon entering building 2004 MOORE approached the coworker.  Moore was not

wearing any shirt but had a dark t-shirt in his hand.  MOORE denied having seen the victim.
The victim was found unconscious in a room where he had no obvious reason to be in with both
arms above his head as if he had been dragged.

Examination of the victim's body was consistent with the victim being strangled to death
using a piece of cloth such as a t-shirt.  Hemorrhaging on the victim's head were consistent with
blows from hands or fists.

While in the custody of American Military Police following the incident, the Defendant
was observed pouring an energy drink into his backpack, which now contained the dark-colored
t-shirt.  When the backpack was searched the t-shirt was wet.  This is consistent with MOORE
attempting to remove forensic evidence from the shirt.

DNA from an abrasion on the victim's right thumb was compared with DNA from
MOORE and was determined to be a match.

Based on the significant evidence provided by the German government and summarized
above, the bar for probable cause has been met.  As such, this Court should issue the certificate
of extradition.  A proposed certificate is attached hereto as Exhibit 2.

## IV.    CONCLUSION

For the foregoing reasons, the United States requests that the Court issue a certificate under 18 U.S.C. § 3184 finding that all the legal requirements for MOORE's extradition have been met.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:

_____/s/_____

Darren S. Gardner
Assistant United States Attorney

21

## **CERTIFCATE OF SERVICE**

I hereby certify that the foregoing was filed via CM/ECF and that in doing so a copy was served on counsel for the fugitive through the CM/ECF system.

Kelly O. Hayes
United States Attorney

By:

_____/s/_____
Darren S. Gardner
Assistant United States Attorney